**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 11-4372**

─────────────

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ERIC DAVID BENNETT,

Defendant-Appellant.

─────────────

Appeal from the United States District Court for the Southern
District of West Virginia, at Beckley.    Irene C. Berger,
District Judge. (5:10-cr-00064-1)

─────────────

Argued:    March 20, 2012        Decided:  April 24, 2012

─────────────

Before TRAXLER, Chief Judge,  and DUNCAN and DAVIS, Circuit
Judges.

─────────────

Vacated and remanded by unpublished per curiam opinion.

─────────────

**ARGUED:** Jonathan D. Byrne, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Charleston, West Virginia, for Appellant.  John Lanier
File, OFFICE OF THE UNITED STATES ATTORNEY, Beckley, West
Virginia, for Appellee.  **ON BRIEF:** Mary Lou Newberger, Federal
Public Defender, Charleston, West Virginia, for Appellant.  R.
Booth Goodwin II, United States Attorney, Charleston, West
Virginia, for Appellee.

─────────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this appeal, we examine whether the district court abused its discretion by imposing two supervised release conditions related to financial matters ("special conditions") in sentencing appellant Eric David Bennett. For the reasons stated within, we conclude that imposition of the special conditions does not pass muster under 18 U.S.C. § 3583(d)(1)-(3) and must therefore be vacated.

I.

On September 14, 2010, Bennett was charged in the United States District Court for the Southern District of West Virginia in a two-count superseding indictment with: (1) knowingly possessing four firearms after having been convicted of a misdemeanor domestic violence offense, in violation of 18 U.S.C. §§ 922(g)(9) and 924(a)(2); and (2) knowingly misrepresenting on a Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") form that he had not been convicted of a felony or crime resulting in more than one year of imprisonment and that he had not been dishonorably discharged from the United States military, in violation of 18 U.S.C. § 1001(a)(2). Bennett entered into a plea agreement with the Government in which he pled guilty to Count One and Count Two was dismissed.

The charges arose from an investigation of Bennett's then most recent, somewhat strange and assuredly violent conduct,

2

reflective of his lengthy and troubled history of involvement in the criminal justice system. Specifically, in October 2008, Bennett was living with his then-girlfriend, Amanda Khurshid, and their infant daughter. When Khurshid discovered that Bennett was still having a relationship with his ex-wife (mother to three of his other children, and a target of prior violent behavior by Bennett), she asked him to leave their home. Bennett refused and Khurshid apparently did not force the issue, hoping the situation would "play out" and he would eventually leave. J.A. 101.

Instead, her decision triggered two weeks of intermittent violence from Bennett. On October 6, after her first confrontation with Bennett, wherein he threatened her with a handgun, took her car keys and she was forced to escape the home through a window, Khurshid sought and was granted an Emergency Protective Order. The next day, Bennett was removed from the home. After his removal, Bennett's conduct towards Khurshid escalated: he sent her messages and made phone calls to her despite being prohibited from contact, he entered the home while she was sleeping and threatened to kill her, he reentered the home when the locks were changed, and apparently he removed screws that Khurshid also had installed to secure the windows. In response to this conduct, Khurshid filed a petition for contempt of the protective order. On the same day that she filed

the petition, and on two days soon after, Bennett repeatedly set off the panic alarm on Khurshid's car and on one occasion slashed two of her tires.

On October 16, after a final hearing regarding the protective order, Bennett physically confronted Khurshid's stepfather in the parking lot of the county courthouse; this attack was interrupted when a police officer wrestled him to the ground. Bennett was arrested for battery and obstructing a police officer and was arraigned that same day; he was released after posting $100,000 bail.

After these events, Bennett's behavior calmed and Khurshid opted to abandon the protective order proceedings. In November 2008, however, Bennett was again making violent threats when he discovered that Khurshid had been on a date with another man, and that she was planning to leave town with their daughter for Thanksgiving. In light of these threats, Khurshid recommenced protective order proceedings and again Bennett reacted violently. On succeeding days, Khurshid found additional vehicle tires had been slashed, Bennett followed her in his car gesturing as if he were shooting a firearm, and he made threatening calls to her.

During this period, Raleigh County Sheriff's Sergeant J.B. Miller began investigating Khurshid's allegations related to the protective orders she was granted. On December 18, 2008,

4

Sergeant Miller ultimately arrested Bennett for stalking and five counts of destruction of property. Miller's on-going investigation quickly revealed that Bennett had pled guilty earlier in 2008 to a misdemeanor crime of domestic violence against his ex-wife, and that he had been dishonorably discharged from the military after convictions for other felony offenses targeting another romantic interest. Miller suspected that Bennett's record of convictions made his possession of firearms unlawful, and also likely prohibited Bennett from working lawfully at Beckley Drilling and Blasting, where he was employed at the time, regularly handling explosives as a blaster.

Miller interviewed Khurshid about Bennett's firearms and she reported that he had left a large gun and a safe, which she believed contained more firearms, at the residence. Shortly thereafter, Miller executed a search warrant at the home and removed a .22 caliber handgun, ammunition, and two safes. Still later, searches pursuant to warrants issued for the safes revealed the four firearms named in the indictment in this case.

As already mentioned, Bennett pled guilty. The presentence report (PSR) calculated a Base Offense Level of 20, enhanced by two levels for the number of firearms involved in the offense (3-7) and reduced by three levels for acceptance of responsibility, for a total Offense Level of 19. Bennett's prior

convictions resulted in five criminal history points, i.e., a Criminal History Category of III. Thus, the PSR calculated a guideline imprisonment range of 37-46 months. The PSR indicated that Bennett had a consistent work history, despite his recurrent trouble with the law, in which he earned as much as $34,000 in 2008 at Beckley Drilling and Blasting.

On March 17, 2011, Bennett appeared before the district court for sentencing. After some discussion of factual objections to the PSR that were all resolved without substantial conflict, Bennett was sentenced at the top of the guideline range, 46 months of imprisonment, followed by three years of supervised release. The court imposed no fine or restitution. The district court imposed, however, as special conditions of supervised release that Bennett "be prohibited from incurring new credit charges or opening additional lines of credit without prior approval of the probation officer," and that he "provide the probation officer access to any requested financial information." J.A. 66.

Bennett's counsel promptly objected that the special conditions were improper because there was "no indication that . . . his financial situation . . . was the basis for this crime." J.A. 69. She further argued that terms of supervised release are "supposed to be those only that are necessary," and that the "credit and financial terms certainly, simply don't have

6

anything to do with Mr. Bennett and his situation." J.A. 70. The court acknowledged the objection but overruled it, explaining that "it's important for any supervising probation officer to know what funding this gentlemen has available to him for possession of firearms and any other matter that would cause or present a situation of danger to someone else . . . ." J.A. 70. The prosecutor declined the court's invitation to offer a view of the matter on behalf of the Government. Bennett has timely appealed the narrow question of whether the district court's imposition of the special conditions of supervised release comport with 18 U.S.C. § 3583.

II.

We find Bennett's challenge to the special conditions meritorious. The discrete question before us is whether a prohibition against "incurring new credit charges or opening additional lines of credit without prior approval of the probation officer," and a requirement to "provide the probation officer access to any requested financial information," J.A. 66, is lawful as applied to Bennett. "District courts 'have broad latitude' with regard to special conditions of supervised release, and we review the court's decision to impose a condition of supervised release for an abuse of discretion." United States v. Holman, 532 F.3d 284, 288 (4th Cir. 2008)

7

(citing United States v. Dotson, 324 F.3d 256, 259, 260 (4th Cir. 2003)).

Federal law provides that supervised release include certain mandatory conditions, such as the prohibition on committing a state or federal offense during the term, or possessing a controlled substance. 18 U.S.C. § 3583(d). In addition to the enumerated mandatory conditions, a sentencing court may impose a further condition:

> to the extent that such condition
>
> (1) is reasonably related to the factors set forth in §§ 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);
>
> (2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and
>
> (3) is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)

Id. The "factors" and "purposes" that constitute the parameters set out above include: "the nature and circumstances of the offense and the history and characteristics of the defendant," § 3553(a)(1); "the need for the sentence imposed to afford adequate deterrence to criminal conduct," § 3553 (a)(2)(B); "to protect the public from further crimes of the defendant," § 3553 (a)(2)(C); and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," § 3553 (a)(2)(D).

8

Bennett argues that the special conditions imposed in this case are unwarranted and unjustified, amounting to an abuse of the district court's discretion, because they fail to meet any of the standards set out in 18 U.S.C. § 3583(d) by being (1) unrelated to a permitted purpose for restrictions, (2) a greater restriction on his liberty than is necessary to achieve permitted purposes and (3) inconsistent with the guidance provided by the Sentencing Commission. The Government argues in response that Bennett's circumstances, "including [a] history of violence, mental illness, drug abuse and non-compliance with authority," support the financial conditions imposed by the court's proper exercise of discretion. Appellee's Br. 9.

Neither Bennett nor the Government points to any case law from this Circuit that speaks directly to the issue before the Court. Instead, Bennett relies heavily on United States v. Brown, 402 F.3d 133 (2d Cir. 2005), in which a defendant with multiple convictions for the sale and distribution of crack cocaine was subject to financial requirements almost identical to Bennett's. The Brown court affirmed the condition that financial records must be made available to a probation officer on request, even where the defendant's crime was not financial and no fine or restitution was imposed, on the grounds that "monitoring an offender's finances deters the offender from returning to a life of crime by forcing him to account for his

9

income." Id. at 137. The court anchored this ruling to the fact that Brown's crimes, while not financial, were directly related to his ability to support himself:

> Brown's criminal record and sparse employment history demonstrate his pronounced proclivity to support himself through drug dealing. In light of his history, the Probation Office needs effective monitoring tools to ensure that Brown does not return to drug dealing after his release from prison. Thus, contrary to Brown's second argument-that Condition 4 is not related to his offense and characteristics-the condition stems directly from his criminal and employment history.

Id.

Despite the nexus between Brown's crimes and his financial situation, the Brown court nevertheless vacated the condition that he be prohibited from opening lines of credit without permission from a probation officer. The court reasoned that Brown's offense and circumstances did not warrant the condition because his offense did not "involve the incursion of debt," nor was his debt "unusually large." Id. at 138. In addition, the court noted that the condition was a "greater deprivation of liberty than reasonably necessary" because use of credit was "likely . . . necessary to facilitate his reintegration into society after his release from prison." Id.

The Government seeks to distinguish Brown by pointing to Bennett's "unique and troubling history." Appellee's Br. 15. It directs our attention to United States v. Camp, 410 F.3d 1042

10

(8th Cir. 2005), and United States v. Behler, 187 F.3d 772 (8th Cir. 1999), as examples of cases where courts have upheld financial conditions for supervised release for non-financial offenses, where no fine or restitution was imposed.

We agree with Bennett, however, that Camp and Behler are materially distinguishable from the instant case. In Camp, the district court imposed financial conditions to specifically address the fact that the defendant was "in arrears" on child support payments and had a "sketchy employment history." Camp, 410 F.3d at 1044. In Behler, the court found financial conditions proper where "money and greed were at the heart of [the defendant's] drug distribution offenses . . . ." Behler, 187 F.3d at 780. Both cases, then, involved defendants whose financial issues were apparent from the record and posed a reasonable threat to their capacity to avoid unlawful conduct after release from prison during the term of supervised release.

In contrast, Bennett's offense of conviction, possessing a firearm as a prohibited person, and all but one of his many prior convictions and arrests, relate exclusively to his dysfunctional and indeed violent relationships with women, not money. The record indicates that Bennett's financial circumstances have played no primary (or even identifiable) role in his criminal activity; money was not a motive for any his acts, nor were the methods of his conduct related in any

11

particular way to a lack or abundance of personal wealth. The special conditions imposed by the district court are therefore unrelated to Bennett's history and characteristics. See 18 U.S.C. § 3583(d)(1) (cross-referencing 18 U.S.C. § 3553(a)(1)).

The special conditions are also unlikely to deter or, in any direct sense, protect the public from future crimes by Bennett because Bennett's behavior in the past does not suggest that money has played any meaningful role in his criminal conduct. Id. (cross-referencing 18 U.S.C. § 3553(a)(2)(B) and (C)). The most compelling deterrence rationale for the financial conditions imposed here relates to Bennett's history of harassing, intimidating, following, and abusing women. The district court noted that financial monitoring would deter Bennett from financing the purchase of firearms in the future and "any other matter that would cause or present a situation of danger to someone else. . ." J.A. 70. Although these dangerous situations were not elaborated, Bennett's history perhaps raised concerns for the district court that he would use his earnings to travel to stalk his current or future partners, or to otherwise finance his unlawful conduct towards them.

Without minimizing the pattern of harmful behavior that is clearly indicated by the record and was properly taken into consideration by the district court when determining other aspects of Bennett's sentence, we agree with Bennett that this

12

rationale for the special conditions of supervised release has no apparent limits; it could "apply in every case." Appellant's Br. 11. The scenarios in which Bennett's income could contribute to unlawful acts are almost effortless to imagine – in part because money can, potentially, facilitate any act that any person undertakes. To the degree that money is the mechanism by which nearly every crime is carried out (drugs are purchased, tools for burglary are purchased, etc.), financial monitoring could always theoretically prevent or deter criminal activity by preventing an offender from using his or her funds to purchase the means of crime. However, the provisions of 18 U.S.C. § 3583(d) are explicit limits on precisely such expansive, generalized control over a released offender's conduct. The statute requires that conditions relate to specific aspects of an offender's circumstances, and while Bennett has a well-documented history of violence against women there is simply no evidence in the record that oversight of Bennett's finances will, in particular, reasonably deter this behavior.

Where financial conditions are so unrelated to a defendant's past and reasonably likely future acts, they constitute a greater deprivation of liberty than is reasonably necessary to achieve the purposes of supervised release that have been articulated by Congress. 18 U.S.C. § 3583(d)(2). Finally, the condition also fails to meet the requirement of

§ 3583(d)(3), i.e., consistency with the policy statements of the Sentencing Commission. The Sentencing Guidelines note that financial monitoring is appropriate where the court has imposed "an order of restitution, forfeiture, or notice to victims, or [has] order[ed] the defendant to pay a fine." U.S.S.G. § 5D1.3(d)(3). While the Guidelines note further that this condition "may otherwise be appropriate in particular cases," id. § 5D1.3(d), the record in the instant case, as explained above, does not provide an adequate basis to so conclude.

## III.

For the foregoing reasons, we conclude that the district court abused its discretion in imposing the challenged financial conditions during Bennett's term of supervised release. Accordingly, we vacate the judgment and remand this case for the entry of an amended judgment striking those conditions of supervised release.

VACATED AND REMANDED

14